IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| JIM HARRICK, SR. and<br>JIM HARRICK, JR.,<br><br>    Plaintiffs,<br><br>v.<br><br>NATIONAL COLLEGIATE<br>ATHLETIC ASSOCIATION,<br>CHRISTOPHER HOWARD and<br>MYLES BRAND,<br><br>    Defendants. | CIVIL ACTION NO.<br>1:04-CV-0541-RWS |

## ORDER

This case is before the Court for consideration of the National Collegiate Athletic Association ("NCAA"), Christopher Howard ("Howard"), and Myles Brand's ("Brand") (the "NCAA Defendants") Motion for Summary Judgment [95]. After reviewing the entire record, the Court enters the following Order.

## Procedural History

This suit arises out of Plaintiffs Jim Harrick, Sr. and Jim Harrick, Jr.'s prior employment as men's basketball coaches at the University of Georgia. On February 26, 2004, Plaintiff filed suit against various institutional and individual defendants, including the NCAA Defendants. On April 30, 2004, the

NCAA Defendants filed a Motion to Dismiss [29]. On February 25, 2005, the Court entered an Order [58] granting the NCAA Defendants' Motion as to all of Plaintiffs' claims except the claim for malicious interference with contract.

On September 16, 2005, the NCAA Defendants filed a Motion for Summary Judgment [95]. In their Response [108], Plaintiffs asserted that they had not been "given a full and fair opportunity to obtain reasonably necessary discovery to refute and respond to the summary judgment motion." (Pls.' Resp. [108] at 2.)

On October 17, 2005, Plaintiffs filed a Motion for Extension of Time to Complete Discovery [104]. On March 30, 2006, the Court entered an Order [110] extending discovery for thirty (30) days. The Court also authorized Plaintiffs to file a supplemental response brief to the NCAA Defendants' Motion for Summary Judgment within twenty (20) days of the close of discovery. The NCAA Defendants were authorized to file a supplemental reply within ten (10) days of their receipt of the Plaintiffs' supplemental response. On April 11, 2006, the Court entered an Order [114] extending discovery through May 31, 2006 and authorizing Plaintiffs until June 20, 2006 to file a supplemental response brief. The NCAA Defendants were authorized to file a supplement reply within ten (10) days of their receipt of Plaintiffs'

supplemental response. On April 14, 2006, the Court entered an Order [115] setting out a specific schedule for the taking of depositions of witnesses.

After the extended discovery period expired, Plaintiffs did not file a supplemental response to the NCAA Defendants' Motion for Summary Judgment. Nevertheless, the NCAA Defendants have filed a Supplemental Reply [116]. The case is now before the Court for consideration of the NCAA Defendants' Motion for Summary Judgment [95].

## **Factual Background**[1]

The NCAA is an unincorporated association of private and public colleges and universities which governs intercollegiate athletics. Brand is the president of the NCAA and Howard was formerly employed by the NCAA. At all times pertinent to the allegations of the Complaint, Brand and Howard acted as agents of and for the NCAA.

### I.   The Harrick's Employment

Jim Harrick, Sr. was previously employed as the men's basketball coach at the University of Georgia under contract with the University of Georgia Athletic Association ("UGAA"). Jim Harrick, Jr. was employed as the

---

[1] The Factual Background is taken from the Statement of Material Facts as to which there is not genuine issue to be tried [95], which facts have been admitted by Plaintiffs.

3

Development Office Field Representative and assistant basketball coach employed by the Board of Regents of the University System of Georgia. During his employment, the UGAA entered into an agreement providing Jim Harrick, Jr. with additional benefits and assurances to induce him to continue his employment as Development Office Field Representative.

On July 1, 2002, an Agreement (the "2002 Contract") was entered into between Jim Harrick, Jr. and the UGAA. Under the terms of that contract, Jim Harrick, Jr. agreed to serve as Field Representative and Coach until June 30, 2003, and to perform certain specific duties which included the following:

> I. Recruiting student-athletes within the rules, regulations, and policies of the National Collegiate Athletic Association ("NCAA"), the Southeastern Conference ("SEC"), the University, and the Association, and who have such personal characteristics as to be well regarded as representatives of the University.
>
> J. Complying with all NCAA, SEC, and University policies, rules, and regulations.

(Adams Ex. 6, p. 1.) Under the terms of his 2002 Contract, Jim Harrick, Jr. also specifically agreed to:

> devote the whole of his time, attention and abilities to his duties as Field Representative and Coach; well and faithfully serve the Association and the University; use his utmost endeavors to promote the interest of the Association, the University, and the student-athletes; and comply with all applicable policies, rules,

4

and regulations of the NCAA, SEC, the University and the Association.

(Id., part 2(A), p. 3.)  Jim Harrick, Jr.'s 2002 Contract also specifically provided that it was subject to termination by reason of "Harrick's deliberate and serious failure to comply with an applicable rule or regulation of the NCAA, SEC or the University, including, but not limited to, those related to recruiting and eligibility of players."  (Id., part 10(A), p. 8.)

On July 1, 2001, Jim Harrick, Sr. entered into an Amended and Restated Agreement (hereinafter the "2001 Contract") with the UGAA.  Under the terms of that contract, Jim Harrick, Sr. agreed to continue to serve as Coach of the Men's basketball team at the University of Georgia until June 30, 2006, or until such earlier time as his employment with the University was voluntarily or involuntarily terminated.  The contract further provided that his duties and responsibilities included the specific requirements that he:

> C.  Recruit[] student-athletes within the rules, regulations, and policies of the National Collegiate Athletic Association ("NCAA"), the Southeastern Conference ("SEC"), the University, and the Association, and who have such personal characteristics as to be well regarded as representatives of the University.
>
> D.  Select[], recommend[] to the Athletic Director, and supervis[e] appropriate, authorized, and qualified coaches, staff, and other assistants.

5

>   J.  Comply[] with all NCAA, SEC, and University policies, rules, and regulations.

(Adams Ex. 5, ¶ 1 (C)(D) and (E), p. 2.)  Under the terms of his 2001Contract, Jim Harrick, Sr. also specifically agreed to:

>   devote his full time, attention and abilities to his duties as Coach; well and faithfully serve the Association and the University; use his utmost endeavors to promote the interest of the Association, the University, and the student-athletes; and comply with all applicable policies,rules and regulations of the NCAA, SEC, the University and the Association.

(Id. at part 2(A), p. 3.)  Jim Harrick Sr.'s 2001 Contract also specifically provided that it was subject to termination by reason of "Harrick's deliberate and serious failure to comply with an applicable rule or regulation of the NCAA, SEC or the University, including, but not limited to, those related to recruiting and eligibility of players."  (Id., part 14(A), p. 15.)

## II.    NCAA Employment Requirements for Member Institutions

A primary function of the NCAA is to regulate intercollegiate athletics among it members so that the athletic programs of its members will be maintained as a vital part of the educational system, and the tradition of amateurism in college sports will be preserved.  NCAA legislation governs the conduct of intercollegiate athletics programs and applies to basic athletics

6

issues such as admissions, financial aid, eligibility and recruiting.  A member institution is obligated to apply and enforce the legislation of the NCAA.

The legislation of the NCAA is founded in part upon the principle of institutional control and responsibility which includes responsibility for the actions of staff members engaged in activities promoting the athletics interests of the institution.  The institution's responsibility for its staff members applies to its obligation to assure that the institution is compliant with the rules of the NCAA.

As part of its adherence to the principles of institutional responsibility and control and rules compliance by staff members of a member institution, the NCAA requires that each member institution include specific language in the contractual agreements that it enters with staff members of its athletics departments.  The contractual language required by the NCAA is set forth in Bylaw 11.2 which provides, in pertinent part, as follows:

> 11.2.1 Stipulation that NCAA Enforcement Provisions Apply. Contractual agreements or appointments between a coach and an institution shall include the stipulation that a coach who is found in violation of NCAA regulations shall be subject to disciplinary or corrective action as set forth in the provisions of the NCAA enforcement procedures.

(Price Aff., ¶ 8.)

7

Additionally, the NCAA Bylaws require each institution to provide annual certification of its compliance with NCAA legislation. This requirement is set forth in Bylaw 30.3, which provision reads, in pertinent part, as follows:

> 30.3 Certification of Compliance. A member institution shall not be eligible to enter a team or individual competitor in an NCAA championship unless its chief executive officer makes an annual institutional eligibility certification [see Bylaw 18.4.2.1-(d)] attesting that the conditions specified below have been satisfied. The certification shall be completed not later than September 15.
>
> . . .
>
> 30.3.3 Certification of Policies, Procedures and Practices. The policies, procedures and practices of the institution, its staff members and representatives of athletics interest are in compliance at the present time with the Association's legislation insofar as the chief executive officer can determine.
>
> 30.3.4 Maintenance of Compliance. It is the intention of the institution to maintain such compliance.

(Id. at ¶ 9.)

In addition to the certification that must be provided by the institution's chief executive officer, the NCAA Bylaws required that the institution provide a statement, signed by all returning staff members, certifying that any NCAA violations have been reported. Specifically, Bylaw 30.3.5 provides as follows:

> 30.3.5 Report of NCAA Violation Involving Institution. A current statement has been filed with the chief executive officer, as a part of the institution's annual certifications, which is signed by each

8

> athletics department staff member (except for clerical personnel), attesting that the individual has reported any knowledge of an involvement in any violations of NCAA legislation involving the institution.

(Id. at ¶ 10.)

Michael Adams, President of the University of Georgia and Chairperson of the UGAA provided the required certification for the University of Georgia in 2001 and 2002. As part of the University's annual certification, the NCAA also requires that each returning staff member of the athletics department of the University sign a Certification of Compliance for Staff Members of Athletics Department, attesting that the signing individual has reported any knowledge of any violations of NCAA legislation involving the institution. The certifications submitted by the returning staff members of the University of Georgia for 2001 and 2002 are signed by the Plaintiffs, Jim Harrick, Sr. and Jim Harrick, Jr. in their capacities as returning staff members of the Athletics Department at that time.

**III.     The Harrick's Separation and Subsequent Lawsuit**

In February 2005, representatives of the University of Georgia and the UGAA initiated an investigation into potential NCAA violations by the Harricks during their employment with the University of Georgia basketball

program.  On March 5, 2005, Jim Harrick, Jr. was notified by Vince Dooley that his contract would not be renewed.  On that same day, Vince Dooley issued a public statement announcing the non-renewal of Jim Harrick, Jr.'s contract.  Jim Harrick, Sr. voluntarily resigned as head basketball coach on March 27, 2003.

On February 26, 2004, Plaintiffs initiated this action asserting numerous claims for relief including, due process violations, defamation, invasion of privacy, violation of the Georgia Open Records Act,  and as relevant to the instant Motion, that the NCAA Defendants tortiously interfered with Plaintiffs' contractual business relationships.

## Discussion

In order for a plaintiff to prevail on a claim for tortious interference with contract, "a plaintiff must establish the existence of a valid contract and that the defendant acted intentionally, without privilege or legal justification, to induce another not to enter into or continue a business relationship with the plaintiff, thereby causing the plaintiff financial injury."  Atlanta Mkt. Ctr. Mgmt., Co. v. McLane, 269 Ga. 604, 608, 503 S.E.2d 278, 282 (1998).  Additionally, the plaintiff must "establish that the defendant is a 'third party' i.e., a 'stranger' to the contract with which the defendant allegedly interfered.  One is not a stranger

to the contract just because one is not a party to the contract." Id.  Proof that a defendant was not a stranger "to the business relations at issue is fatal to [a plaintiff's] claim of tortious interference with business relations." Voyles v. Sasser, 221 Ga. App. 305, 306, 472 S.E.2d 80, 82 (1996).

"In order to be liable for tortious interference, one must be a stranger to both the contract at issue and the business relationship giving rise to and underpinning the contract."  Atlanta Mkt. Ctr. Mgmt., Co. 269 Ga. at 609. "[T]hose who benefit from the contract of others, without regard to whether the beneficiary was intended by the contracting parties to be a third-party beneficiary" are not strangers to the contract.  Id.  "[A]ll parties to a comprehensive interwoven set of contracts are not liable for tortious interference with any of the contracts or business relationships."  Galardi v. Steele-Inman, 266 Ga. App. 515, 521, 597 S.E.2d 571, 577 (2004).

The responsibilities of Plaintiffs under their employment contracts related to their operating and overseeing the participation by the University of Georgia in intercollegiate basketball.  That program is subject to and dependent upon the University of Georgia's participation in the NCAA and compliance with NCAA legislation.  Plaintiffs' employment contracts specifically required compliance with NCAA legislation and provided for termination of the contract for failure

11

to maintain compliance. The NCAA was "an essential entity" in the employment relationships at issue. Renden, Inc. v. Liberty Real Estate Ltd. Partnership III, 213 Ga. App. 333, 335, 444 S.E.2d 814, 818 (1994). Therefore, the NCAA is not a stranger to the contracts, and thus, cannot be liable for tortious interference with those contracts.

The claims against Defendants Howard and Brand are based upon their having acted as agents of the NCAA. Because they were acting as agents of the NCAA, they are not strangers to the contractual relationship. Atlanta Mkt. Ctr. Mgmt., Co., 269 Ga. at 608. Therefore, the NCAA Defendants are entitled to summary judgment in their favor on Plaintiffs' tortious interference claim.

## Conclusion

Based on the foregoing, the NCAA Defendants' Motion for Summary Judgment [95] is hereby **GRANTED** as to Plaintiffs' tortious interference with contract claim. Because this claim was the only claim remaining in this action, the Clerk is **DIRECTED** to close this case.

**SO ORDERED**, this   19th   day of September, 2006.

_____
RICHARD W. STORY
UNITED STATES DISTRICT JUDGE

AO 72A
(Rev.8/82)